# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **MARY E. O'COIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:13CV364 ACL** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Mary E. O'Coin for Disability Insurance Benefits under Title II of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. [Doc. 8] Defendant filed a Brief in Support of the Answer. [Doc. 15] Plaintiff has filed a Reply. [Doc. 22]

## Procedural History

On March 30, 2010, Plaintiff filed an application for Disability Insurance Benefits, claiming that she became unable to work due to her disabling condition on June 30, 2006. (Tr. 92-96.) This claim was denied initially and, following an administrative hearing, Plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated January 19, 2012. (Tr. 50, 9-23.) Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on December 27, 2012. (Tr. 7, 1-6.) Thus, the decision of the ALJ stands as the final decision of the

Commissioner. <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

<u>**Evidence Before the ALJ**</u>

**A.**    <u>**ALJ Hearing**</u>

Plaintiff's administrative hearing was held on December 7, 2011. Plaintiff was present and was represented by counsel. Also present was vocational expert Delores E. Gonzalez.

The ALJ questioned Plaintiff, who testified that she was forty-four years of age, and was a high school graduate. (Tr. 31.)

Plaintiff stated that she worked at Wendy's as a shift manager for "a couple of years" beginning in 1996. (Tr. 32) Plaintiff testified that she worked as a salvage coordinator at Safeco from 1997 to 2006. <u>Id</u>. Plaintiff stated that she worked as a bookkeeper and office manager at Carpenter Health Care prior to 1996. (Tr. 33)

Plaintiff testified that she was fired from her position at Safeco in 2006, because she was unable to perform her job. <u>Id</u>. Plaintiff explained that she had difficulty with concentration and would "get lost" in the middle of telephone conversations with customers. <u>Id</u>.

Plaintiff stated that she was not using cocaine or marijuana at the time she was fired. <u>Id</u>. The ALJ noted that Plaintiff's medical records indicate that she admitted to smoking marijuana in August of 2007. (Tr. 34) Plaintiff testified that she does not remember when she stopped smoking marijuana, but she had not smoked it in "quite some time." <u>Id</u>. Plaintiff stated that she had smoked marijuana to treat her pain, but she stopped smoking marijuana when she obtained pain medication. <u>Id</u>.

Plaintiff testified that she was five-feet, seven-inches tall, and weighed 230 pounds at the time of the hearing. (Tr. 35.) She stated that she had gained weight due to inactivity. <u>Id</u>.

Plaintiff testified that she was receiving psychological care for depression and that the depression "kills" her. Id. Plaintiff stated that, due to her depression, she does not shower often, does not have any friends, does not clean, and does not do "much of anything." (Tr. 36.) Plaintiff testified that she had not gone gambling in approximately five years. Id.

Plaintiff stated that she has difficulty remembering to take her medication, and that her mother reminds her. Id.

Plaintiff testified that she was injured in a shooting incident in 2003. Id. Plaintiff stated that she was working for Safeco at the time of the shooting. Id. Plaintiff testified that her hearing was tested in 2003, and it was determined that she has no hearing in her left ear. (Tr. 37.) Plaintiff stated that she also has no feeling on the left side of her face, no feeling in her tongue, and no taste buds. Id.

Plaintiff's attorney questioned Plaintiff, who testified that, as a result of her depression, she does not want to do anything, wants to sleep all the time, has no friends, and wants to hide by herself. Id. Plaintiff stated that, about half of a typical week, she spends the entire day in bed. (Tr. 37-38.) Plaintiff stated that she experiences crying spells "a couple of days a week." (Tr. 38) Plaintiff testified that she has been hospitalized for experiencing suicidal thoughts. Id. Plaintiff stated that she still experiences suicidal thoughts occasionally, and that her mother comforts her when this occurs. (Tr. 39)

Plaintiff testified that she is unable to concentrate long enough to read a book or watch a program on television. Id. Plaintiff stated that she does not do any household chores. Id. Plaintiff testified that she no longer cooks, because she has left the oven on inadvertently and burnt things. Id.

Plaintiff's attorney next examined Ellen O'Coin, Plaintiff's mother, who testified that

Plaintiff was living with her at the time of the hearing. (Tr. 40.) Ms. O'Coin stated that Plaintiff had lived with her since the 2003 shooting. Id. Ms. O'Coin testified that she retired in 2010. Id.

Ms. O'Coin stated that Plaintiff does not help much with housework, because she forgets to complete tasks; Plaintiff is unable to follow simple instructions without having them repeated, and is unable to maintain concentration or focus; and she reminds Plaintiff to take her medication constantly throughout the day. (Tr. 41)

Ms. O'Coin stated that she observes Plaintiff rubbing her face frequently due to pain she experiences. (Tr. 42)

When asked by the ALJ, Ms. O'Coin did not know why Plaintiff went a month without taking medications in July of 2011. (Tr. 43.) Ms. O'Coin stated that she either refills Plaintiff's medications and picks them up herself, or she accompanies Plaintiff when she picks up her medication. Id.

The ALJ next examined the vocational expert, Ms. Gonzalez. (Tr. 44) The ALJ asked Ms. Gonzalez to assume a hypothetical claimant with Plaintiff's background and the following limitations: able to perform a full range of light work; able to understand, remember, and carry out at least simple instructions and non-detailed tasks; should not work in a setting that includes constant or regular contact with the general public; should not perform work that includes more than infrequent handling of customer complaints; and should not work in close proximity to alcohol or controlled substances. Id. Ms. Gonzalez testified that the individual would be unable to return to any of Plaintiff's past work. Id. Ms. Gonzalez stated that the individual could perform other light, unskilled work, such as housekeeping/cleaner (887,890 positions nationally, 21,660 in Missouri); and mail clerk (131,750 positions nationally, 3,430 in Missouri). (Tr.

44-45.)

Plaintiff's attorney asked Ms. Gonzalez to assume an individual with Plaintiff's background who, due to memory problems and poor concentration, is unable to remain on task in excess of 25 percent of the time.   (Tr. 45-46)   Ms. Gonzalez testified that the individual would be unable to perform any work in the national economy.   (Tr. 46)

**B.    Relevant Medical Records**

The record reveals Plaintiff received treatment at Anderson Hospital and St. Louis University in June 2003 after sustaining a gunshot wound to the head.   (Tr. 441-62, 259-310.) Plaintiff suffered multiple facial fractures and underwent extensive facial reconstruction surgeries. (Tr. 240-306, 483-521.)   Plaintiff also injured her left ear and had difficulty hearing on the left side.   (Tr. 413-36.)

Plaintiff began receiving mental health treatment from St. Charles Psychiatric Associates in November of 2003.   Plaintiff was prescribed Prozac[1] and Seroquel[2] for depression.   (Tr. 337-38)   In September 2004, it was noted that Plaintiff was having adjustment problems following the shooting incident in which her boyfriend shot her and then killed himself.   (Tr. 341) Plaintiff was diagnosed with adjustment disorder and was assessed a GAF score[3] of 61.[4]   (Tr.

---

[1]Prozac is indicated for the treatment of major depressive disorder.   See Physician's Desk Reference (PDR), 2521 (63rd Ed. 2009).

[2]Seroquel is an anti-psychotic drug indicated for the treatment of bipolar disorder and schizophrenia.   See WebMD, http://www.webmd.com/drugs (last visited July 3, 2014).

[3]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."   Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[4]A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."   DSM-IV at 32.

344.)

Plaintiff saw neurologist, Karen Pentella, M.D., from April 2004 through January 2005, for complaints of headaches and chronic facial pain after sustaining a gunshot wound.   (Tr. 352-67.) Physical examinations revealed decreased range of motion in her jaw, decreased strength in the upper left side of her face, decreased sensation on the left side of her tongue and decreased hearing on the left.   Id.   Mental status examinations consistently noted a sad affect and depressed affect. Plaintiff was diagnosed with multiple facial fractures, headache NOS, facial nerve palsy, facial numbness, depression, chemical dependency disorder, and temporomandibular joint dysfunction. Id.

Plaintiff was admitted at Two Rivers Psychiatric Hospital from April 25, 2005, through May 6, 2005, for evaluation and treatment.   (Tr. 377)   Plaintiff reported feeling "really depressed," and experiencing suicidal ideation.   It was noted Plaintiff had a suicide attempt via overdose in the recent past.   (Tr. 382.)   Upon examination, Plaintiff had decreased grooming and hygiene, endorsed thoughts of life not being worth living, and her insight and judgment were "fair."   (Tr. 383)   Plaintiff was diagnosed with posttraumatic stress disorder;[5] major depression, recurrent, severe without psychotic features; cannabis dependence; and cocaine abuse; with a GAF score of 30[6] upon admission, and the highest in the past year of 45.[7]   Id.   Plaintiff was treated

---

[5]Development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently re-experiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria.   Stedman's Medical Dictionary, 570 (28th Ed. 2006).

[6]A GAF score of 21 to 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."   DSM-IV at 32.

[7]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social,

with multiple psychotropic medications, and it was noted that Wellbutrin[8] seemed to have the most effectiveness.  (Tr. 377)   Upon discharge, Plaintiff reported that her mood was "doing better," and her affect seemed to be brighter and more euthymic.   Id.   Plaintiff was assessed a GAF score of 40-50, and was instructed to follow-up with outpatient services.   Id.

Plaintiff underwent additional facial plastic surgery performed by Gregory Branham, M.D., on May 16, 2006.   (Tr. 477-79.)

Plaintiff saw Michelle Filippi-Robb, MA, at Crider Health Center ("Crider") for a mental health assessment on July 25, 2007.   (Tr. 534.)   Plaintiff reported that she was "in a deep depression" and was unable to sleep.   Id.   Plaintiff indicated that she had lost her job and she continued to experience a lot of physical pain due to her injuries.   Id.   Plaintiff reported that she had been experiencing depressive symptoms for "fifteen plus years," but she was not able to seek psychiatric treatment until after the shooting incident, because her boyfriend would "not allow" her to seek treatment.   (Tr. 541.)   Plaintiff had attempted suicide twice.   Id.   Plaintiff's most recent symptoms included:   lack of energy, crying spells, isolation, disruptive sleep, and feelings of hopelessness and worthlessness.   Id.   Plaintiff reported that she used marijuana "as often as possible," to assist her in coping with physical and emotional symptoms.   Id.   Upon examination, Plaintiff's attention and memory were normal, her ability to process abstract ideas was fair, her judgment and insight were fair, her attitude was pleasant and cooperative, and her intellect appeared normal.   (Tr. 540.)   Plaintiff was diagnosed with major depressive disorder, recurrent; and cannabis dependence.   (Tr. 541.)   It was recommended that Plaintiff meet with a psychiatrist and begin a medication regimen.   Id.

occupational, or school functioning (e.g., no friends, unable to keep a job)."   DSM-IV at 32.
[8]Wellbutrin is an antidepressant drug indicated for the treatment of major depressive disorder. See PDR at 1653-54.

Plaintiff saw Omar Quadri, M.D., at Crider for an Initial Psychiatric Assessment on August 8, 2007. (Tr. 543.) Upon examination, Plaintiff was well-groomed, polite, calm and cooperative; reported feeling sad, depressed, and anxious; her affect was anxious with no lability; her responses were logical and goal directed; and her insight and judgment were good. (Tr. 543-44.) Dr. Quadri diagnosed Plaintiff with major depressive disorder and cannabis abuse, and prescribed Cymbalta,[9] Trazodone,[10] and Lorazepam.[11] (Tr. 544.) On August 22, 2007, Plaintiff reported a low energy level and motivation and requested Ritalin.[12] (Tr. 585) Plaintiff's mood was fair. Plaintiff was using marijuana three to four times a week. Id. Dr. Quadri discontinued the Lorazepam, added Hydroxyzine[13] for anxiety, and noted that Plaintiff was "drug seeking for benzos and Ritalin." Id.

Plaintiff saw David A. Lipsitz, Ph.D., for a psychological consultation upon the referral of the state agency on August 28, 2007. (Tr. 526.) Plaintiff reported experiencing depression, insomnia, diminished energy level, diminished interest level, recurrent anxiety attacks, and suicidal thoughts. (Tr. 527.) Upon examination, Plaintiff appeared "in some acute distress." (Tr. 528.) Plaintiff's affect was flat, her mood was depressed, and her intellectual functioning appeared to be within the "borderline" range. Id. Dr. Lipsitz found that Plaintiff showed memory problems for both recent and remote events, her concentration was poor, her insight and

---

[9]Cymbalta is indicated for the treatment of major depressive disorder and generalized anxiety disorder. See PDR at 1801.

[10]Trazodone is an antidepressant indicated for the treatment of depression and other mood disorders. See WebMD, http://www.webmd.com/drugs (last visited July 3, 2014).

[11]Lorazepam is indicated for the treatment of anxiety. See WebMD, http://www.webmd.com/drugs (last visited July 3, 2014).

[12]Ritalin is indicated for the treatment of attention deficit hyperactivity disorder. See WebMD, http://www.webmd.com/drugs (last visited July 3, 2014).

[13]Hydroxyzine is indicated for the short-term treatment of anxiety. See WebMD, http://www.webmd.com/drugs (last visited July 3, 2014).

judgment were poor, and her thought processes were primarily preoccupied with her multiple somatic problems from the gunshot wound and her inability to function within society.   Id.   Dr. Lipsitz diagnosed Plaintiff with major depression, rule out post-traumatic stress disorder; and a GAF score of 47.   Id.   Dr. Lipsitz stated that Plaintiff was in need of ongoing psychiatric treatment combining medication with individual psychotherapy.   (Tr. 529.)   Dr. Lipsitz found that Plaintiff was unable to handle her own financial affairs in a satisfactory manner.   Id.   Dr. Lipsitz stated that Plaintiff was able to understand and remember instructions, but "she is having difficulty sustaining concentration and persistence with tasks and she is having difficulty interacting socially and adapting to her environment."   Id.

Marc Maddox, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique on September 12, 2007.   (Tr. 549-59.)   Dr. Maddox found that Plaintiff's depression was severe, but it was not expected to last twelve months.   (Tr. 549.)   Dr. Maddox stated that Plaintiff was severely depressed at that time and it was unlikely that she would be able to work. Dr. Maddox stated that Plaintiff stopped taking her medications over a year ago and was placed back on medications in August of 2007.   (Tr. 559)   Dr. Maddox stated that "[i]t is anticipated that her condition will improve within 12 months and become not severe as long as she continues with treatment."   Id.   Dr. Maddox expressed the opinion that, in August of 2008, Plaintiff would have only mild limitations in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace.   (Tr. 557)

Plaintiff saw Dr. Quadri for follow-up on September 12, 2007, at which time Plaintiff continued to feel tired and poorly motivated.   Plaintiff's mood was better.   She continued to use marijuana three to four times a week.   Dr. Quadri increased Plaintiff's dosage of Cymbalta.   (Tr. 587.)   On October 23, 2007, Plaintiff reported that her mood was "a lot better," with significant

reduction in depression and anxiety. (Tr. 588.) Plaintiff continued to report poor motivation and low energy level all day. Id. Dr. Quadri added Deplin[14] to Plaintiff's medication regimen. Id. On November 20, 2007, Plaintiff reported a good mood, and an improved motivation and energy level with the addition of Deplin. (Tr. 589.) Plaintiff had decreased her marijuana usage to about once a month. Id. Plaintiff requested Xanax[15] to help calm her down, as she was anxious about seeing family over the holidays. Id. Dr. Quadri prescribed a limited supply of Xanax to get Plaintiff through the holidays. Id.

Plaintiff presented to Dr. Quadri on May 7, 2008, after "a hiatus of 6 months." (Tr. 590.) Plaintiff had been off all of her medications "for several months." Id. Plaintiff reported that she was doing fine until quite recently, when she decompensated in the context of a break-up with her boyfriend. Id. Plaintiff experienced an abandonment crisis when her boyfriend refused to leave his wife for her. Id. Plaintiff felt depressed, had low energy and poor motivation, and her sleep was disturbed by nightmares. Id. Plaintiff denied alcohol, marijuana or other drug abuse. Id. Dr. Quadri diagnosed Plaintiff with major depressive disorder; cannabis and cocaine abuse in full remission; gambling addiction; and borderline personality disorder.[16] Id. He restarted Plaintiff on Cymbalta, Trazodone, and Deplin. Id. On June 10, 2008, Plaintiff reported that she had started seeing her married boyfriend again. (Tr. 591.) Plaintiff continued to feel depressed due to her current situation. Id. Plaintiff felt tired and poorly motivated, but indicated that the

---

[14]Deplin is a derivative of folate indicated for the treatment of depression. See WebMD, http://www.webmd.com/drugs (last visited July 3, 2014).

[15]Xanax is a benzodiazepine indicated for the treatment of anxiety and panic disorders. See WebMD, http://www.webmd.com/drugs (last visited July 3, 2014).

[16]An enduring and pervasive pattern that begins by early adulthood and is characterized by impulsivity and unpredictability, unstable interpersonal relationships, inappropriate or uncontrolled affect, identity disturbances, rapid shifts of mood, suicidal acts, self-mutilations, job and marital instability, chronic feelings of emptiness or boredom, and intolerance of being alone. See Stedman's at 568.

Deplin gave her an energy boost.  Id.  Dr. Quadri continued Plaintiff's medications.  Id.  On July 8, 2008, Plaintiff felt lonely and depressed.  (Tr. 592.)  Plaintiff reported that she was trying to stay away from her ex-boyfriend, but she had taken his calls on a couple of occasions.  Id.  On August 27, 2008, Plaintiff reported feeling much better.  (Tr. 593.)  Plaintiff had not been seeing her ex-boyfriend, and she was helping her parents with chores.  Id.  Dr. Quadri decreased Plaintiff's dosage of Trazodone due to the sedative effect Plaintiff reported.  Id.  On December 10, 2008, Plaintiff was "emotionally doing well."  (Tr. 594.)  Plaintiff's affect was euthymic, her mood was good, she was sleeping well, her energy was fair, she had no anhedonia, and her concentration was good.  Id.  Dr. Quadri continued Plaintiff's medications.  Id.  On February 11, 2009, Plaintiff's mood was good and her affect was euthymic.  (Tr. 595.)  Plaintiff denied feeling sad or depressed and her energy level was good.  Id.  Plaintiff was helping her mother with arrangements for her brother's wedding.  Id.  On July 1, 2009, Plaintiff denied feeling depressed, but reported low energy and poor motivation.  (Tr. 596.)  Dr. Quadri increased Plaintiff's dosage of Cymbalta (Duloxetine).  Id.

Plaintiff presented to the emergency department at St. Joseph Health Center on November 29, 2009, with complaints of depression, suicidal thoughts, anxiety, and stress.  (Tr. 566.)  Upon examination, Plaintiff appeared distressed and anxious.  (Tr. 567.)  Plaintiff was diagnosed with depression, and was admitted.  (Tr. 569.)  On November 30, 2009, Plaintiff reported that she had become depressed and reported thoughts of suicide after ending a relationship with a married man five days prior.  Id.  Saaid Khojasteh, M.D., diagnosed Plaintiff with major affective disorder, depression, recurrent; rule out bipolar disorder; rule our borderline personality; and a GAF score of 30.  (Tr. 570.)  Plaintiff received medication management and counseling.  (Tr. 574.)  Plaintiff was discharged on December 9, 2009, with diagnoses of major affective disorder, depression,

recurrent; probable bipolar affective disorder;[17] probable borderline personality disorder; and a

GAF score of 50.   (Tr. 575.)   Plaintiff was prescribed Cymbalta, Trazodone, and Seroquel.   (Tr.

574.)

Plaintiff presented to Dr. Quadri on December 16, 2009.   (Tr. 597.)   Dr. Quadri noted that

Plaintiff had become non-compliant with follow-up and medication since her last visit in July of

2009.   Id.   Dr. Quadri indicated that Plaintiff's recent hospitalization was consistent with an

abandonment crisis of borderline personality disorder.   Id.   Plaintiff reported that she had not had

any suicidal thoughts since her discharge, but she was tearful and constantly crying during the

interview.   Id.   Plaintiff indicated that she had been smoking marijuana.   Id.   Dr. Quadri

continued the Cymbalta, discontinued Seroquel, increased the Trazodone, and added Lunesta.[18]

Id.   On January 19, 2010, Dr. Quadri noted Plaintiff's mood had improved dramatically since she

was back with her boyfriend.   (Tr. 598.)   Plaintiff's speech was slightly pressured.   Id.

Plaintiff's mother reported that Plaintiff could go several days of sleeping up to forty hours, and

then she has periods of insomnia and seems to have a lot of energy.   Id.   Dr. Quadri diagnosed

Plaintiff with possible bipolar II disorder.[19]   Id.   He reduced Plaintiff's dosage of Cymbalta and

added Abilify[20] for mood stabilization and possible bipolar disorder.   Id.   On February 17, 2010,

Plaintiff reported sleeping a lot, but feeling tired again within hours after waking.   (Tr. 599.)

Plaintiff was using a little bit of marijuana every day.   Id.   Plaintiff's mood had been good, and

she was not feeling depressed.   Id.   Plaintiff's boyfriend was "working on getting divorced," and

[17]An affective disorder characterized by the occurrence of alternating manic, hypomanic or mixed
episodes and with major depressive episodes.   See Stedman's at 1729.
[18]Lunesta is indicated for the treatment of insomnia.   See PDR at 2994-95.
[19]An affective disorder characterized by the occurrence of alternating hypomanic and major
depressive episodes.   Stedman's at 568.
[20]Abilify is an antipsychotic drug indicated for the treatment of bipolar disorder and major
depressive disorder.   See PDR at 881.

was living with Plaintiff at her parents' home.   Id.   Dr. Quadri reduced Plaintiff's dosage of

Cymbalta, and increased her dosage of Abilify.   Id.   On March 24, 2010, Plaintiff reported that

she was "doing really well."   (Tr. 600.)   Plaintiff's mood was good and her affect was euthymic.

Plaintiff was walking with her mother every morning and felt more energetic.   Id.   She continued

to smoke marijuana twice weekly.   Id.   Dr. Quadri diagnosed Plaintiff with bipolar disorder II;

cannabis abuse-active; cocaine abuse in full remission; gambling addiction; and borderline

personality disorder.   Id.   He continued Plaintiff's medications.   Id.

Robert Cottone, Ph.D., a state agency psychologist, completed a Psychiatric Review

Technique on June 21, 2010.   (Tr. 605-16.)   Dr. Cottone diagnosed Plaintiff with bipolar

disorder, personality disorder, cannabis abuse, and cocaine abuse.   (Tr. 608-11.)   Dr. Cottone

expressed the opinion that Plaintiff had mild limitations in her activities of daily living; moderate

limitations in her ability to maintain social functioning; moderate limitations in her ability to

maintain concentration, persistence, or pace; and one or two episodes of decompensation.   (Tr.

613.)

Dr. Cottone also Completed a Mental Residual Functional Capacity Assessment (Tr.

617-619), in which he found Plaintiff was moderately limited in the following areas:   ability to

maintain attention and concentration for extended periods; ability to work in coordination with or

proximity to others without being distracted by them; ability to complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods; ability to interact

appropriately with the general public; ability to accept instructions and respond appropriately to

criticism from supervisors; ability to get along with coworkers or peers without distracting them or

exhibiting behavioral extremes; and ability to set realistic goals or make plans independently of

others.   Id.   Dr. Cottone found that Plaintiff had marked limitations in the following areas:
ability to understand and remember detailed instructions; and ability to carry out detailed
instructions.   Id.   Dr. Cottone stated that Plaintiff must avoid work involving:   intense or
extensive interpersonal interaction; handling complaints or dissatisfied customers; close proximity
to co-workers; and close proximity to available controlled substances.   Id.   Dr. Cottone stated
that Plaintiff is able to:   understand, remember, carry out, and persist at simple tasks; make simple
work-related judgments; relate adequately to co-workers or supervisors; and adjust adequately to
ordinary changes in the work routine or setting.   Id.

Plaintiff presented to Dr. Quadri on June 23, 2010, at which time her mood was good and
her affect was euthymic.   (Tr. 640.)   Plaintiff denied feeling depressed.   Id.   Plaintiff did report
poor motivation and energy level.   Id.   Plaintiff had not smoked marijuana in "a couple of
months."   Id.   Dr. Quadri added Wellbutrin to Plaintiff's medication regimen.   Id.   Plaintiff
presented to Dr. Quadri on December 15, 2010, after being non-complaint with follow-up for six
months.   (Tr. 641)   Plaintiff had ended a relationship with a married man three months prior and
had been depressed.   Id.   Plaintiff also reported low energy and poor motivation to do anything.
Plaintiff had not used marijuana in months.   Id.   On January 12, 2011, Plaintiff's mood had
improved "a lot."   (Tr. 642.)   Plaintiff reported feeling good and her affect was euthymic.   Id.
Plaintiff continued to sleep excessively and her energy level was fair.   Id.   Plaintiff denied
alcohol or marijuana use.   Id.   On March 2, 2011, Plaintiff reported feeling better.   (Tr. 643.)
Plaintiff denied feeling depressed or anxious.   Id.   Plaintiff was smoking marijuana twice a week
"to calm down."   Id.   On July 13, 2011, Plaintiff reported she felt she was "going down hill."
(Tr. 644.)   She had been non-compliant with medications for one month.   Id.   Plaintiff's mood
was bad and she became tearful.   Id.   Plaintiff's energy level was low, and she was poorly

motivated.   Id.   She was not attending to personal grooming and reported it was "hard to even take a shower."   Id.   Plaintiff denied marijuana or alcohol use.   Id.   Dr. Quadri resumed Plaintiff's medications.   Id.   On August 17, 2011, Plaintiff reported having no motivation and a low activity level.   (Tr. 645.)   Her mood was "down," and she was experiencing crying spells.   Id.   Plaintiff reported poor personal grooming, noting "I don't go anywhere so why shower," and "I don't have a life."   Id.   Plaintiff's concentration and attention span were "not good."   Id.   Plaintiff denied marijuana or alcohol use.   Id.

## The ALJ's Determination

The ALJ made the following findings:

1.   The claimant last met the insured status requirements of the Social Security Act on December 31, 2011.

2.   The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 30, 2006 through her date last insured of December 31, 2011(20 CFR 404.1571 *et seq*.).

3.   Through the date last insured, the claimant had the severe impairments of obesity, bipolar disorder, personality disorder and cannabis abuse (20 CFR 404.1520(c)).

4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b).   The claimant can lift 20 pounds occasionally, ten pounds frequently, walk/stand approximately six hours out of eight, and sit at least six hours out of eight.   The claimant can understand, remember and carry out at least simple instructions and non-detailed tasks.   She should not work in a setting which includes constant/regular contact with the general public; should not perform work which includes more than infrequent handling of customer complaints; should not work in close proximity to alcohol or controlled substances.

6.   Through the date last insured, the claimant was unable to perform any past relevant

work (20 CFR 404.1565).

7.      The claimant was born on November 26, 1967 and was 44 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.      The claimant has a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.      The claimant was not under a disability, as defined in the Social Security Act, at any time from June 30, 2006, the alleged onset date, through December 31, 2011, the date last insured (20 CFR 404.1520(g)).

(Tr. 14-23).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on March 30, 2010, the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act through December 31, 2011, the last date insured.

(Tr. 23.)

## Discussion

**A.     Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.   See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).   If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.   See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.   See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).   "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."   Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).   The analysis required has been described as a "searching inquiry."   Id.

**B.    Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a).   The claimant has the burden of proving that s/he has a disabling impairment.   See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.   See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).   First, it is determined whether the claimant is currently engaged in "substantial gainful employment."   If the claimant is, disability benefits must be denied.   See 20 C.F.R. §§

404.1520, 416.920 (b).   Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.   See 20 C.F.R §§ 404.1520 (c), 416.920 (c).   To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."   Id.   Age, education and work experience of a claimant are not considered in making the "severity" determination.   See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.   See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).   This listing is found in Appendix One to 20 C.F.R. 404.   20 C.F.R. pt. 404, subpt. P, App. 1.   If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.   See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).   If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.   See 20 C.F.R. § 404.1520 (e), 416.920 (e).   If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.   See id.   If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).   The claimant is entitled to disability benefits only if s/he is not able to perform any other work.   See id.   Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.   See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.   See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).   If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).   The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work:   activities of daily living, social functioning, concentration, and persistence or pace.   See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).   Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.   See id.   Next, the Commissioner must determine the severity of the impairment based on those ratings.   See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).   If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.   See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.   See id.   If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.   See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claim

Plaintiff argues that the ALJ erred in evaluating the medical opinion evidence when assessing her mental RFC.    Plaintiff does not challenge the ALJ's findings with regard to Plaintiff's physical RFC.

The ALJ made the following determination with regard to plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b).    The claimant can lift 20 pounds occasionally, ten pounds frequently, walk/stand approximately six hours out of eight, and sit at least six hours out of eight.    The claimant can understand, remember and carry out at least simple instructions and non-detailed tasks.    She should not work in a setting which includes constant/regular contact with the general public; should not perform work which includes more than infrequent handling of customer complaints; should not work in close proximity to alcohol or controlled substances.

(Tr. 16.)

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations.    Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.    Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).    Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.    See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record).    An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.    See Cox v.

20

Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

      Plaintiff argues that the ALJ erred in failing to discuss the opinions of consultative psychologist Dr. Lipsitz and state agency psychologist Dr. Maddox.   Plaintiff contends that the relevant regulations require the ALJ to explain the weight given to these opinions.

      In making a disability determination, the ALJ shall "always consider the medical opinions in [the] case record together with the rest of the relevant evidence" in the record.   20 C.F.R. § 404.1527(b).   See Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009).   "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions."   20 C.F.R. § 404.1527(a)(2). The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians.   Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001).   "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist."   20 C.F.R. § 404.1527(e)(2)(ii).

      The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole.   Pearsall, 274 F.3d at 1219.   "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'"   Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)).   The opinion

of an examining physician is generally entitled to more weight than the opinion of a non-examining physician.  20 C.F.R. § 404.1527(d)(1).

In this case, the ALJ indicated that he was affording "considerable weight" to Plaintiff's "treating and examining physicians, none of whom placed any restrictions on the claimant, and the remainder of the medical record."  (Tr. 21.)  The ALJ also stated that the opinion of the "agency reviewer" was "unrefuted by any treating or examining source."  Id.  The ALJ did not mention the opinions of Drs. Lipsitz and Maddox.

Plaintiff saw Dr. Lipsitz, a consultative psychologist, on August 28, 2007, upon the referral of the state agency.  (Tr. 526.)  Upon examination, Plaintiff appeared "in some acute distress."  (Tr. 528.)  Plaintiff's affect was flat, her mood was depressed, and her intellectual functioning appeared to be within the "borderline" range.  Id.  Dr. Lipsitz found that Plaintiff showed memory problems for both recent and remote events, her concentration was poor, her insight and judgment were poor, and her thought processes were primarily preoccupied with her multiple somatic problems from the gunshot wound and her inability to function within society. Id.  Dr. Lipsitz diagnosed Plaintiff with major depression, rule out post-traumatic stress disorder; and a GAF score of 47.  Id.  Dr. Lipsitz found that Plaintiff was unable to handle her own financial affairs in a satisfactory manner.  (Tr. 529.)  Dr. Lipsitz stated that Plaintiff was able to understand and remember instructions, but "she is having difficulty sustaining concentration and persistence with tasks and she is having difficulty interacting socially and adapting to her environment."  Id.

On September 12, 2007, non-examining state agency psychologist Marc Maddox completed a Psychiatric Review Technique.  (Tr. 549-59.)  Dr. Maddox found that Plaintiff's depression was severe, but it was not expected to last twelve months.  (Tr. 549.)  Dr. Maddox

stated that Plaintiff was severely depressed at that time and it was unlikely that she would be able to work. (Tr. 559) Dr. Maddox stated that Plaintiff stopped taking her medications over a year ago and was placed back on medications in August of 2007. Id. Dr. Maddox stated that "[i]t is anticipated that her condition will improve within 12 months and become not severe as long as she continues with treatment." Id. Dr. Maddox expressed the opinion that, in August of 2008, Plaintiff would have only mild limitations in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace. (Tr. 557)

The undersigned finds that the ALJ erred in assessing the medical opinion evidence. The ALJ failed to provide any discussion of the opinions of Drs. Lipsitz or Maddox. The ALJ indicated that he was affording "considerable weight" to Plaintiff's "treating and examining physicians, none of whom placed any restrictions on the claimant..." (Tr. 21.) Dr. Lipsitz, however, was an examining psychologist, and found that Plaintiff had multiple restrictions due to her psychiatric impairments. Dr. Lipsitz noted significant findings on examination, and found that Plaintiff had difficulty sustaining concentration and persistence with tasks, difficulty interacting socially, difficulty adapting to her environment, and was unable to handle her financial affairs. (Tr. 529.) There is no indication that the ALJ considered Dr. Lipsitz's findings, as he made no reference to Dr. Lipsitz's report, and did not indicate the weight, if any, he was assigning to the opinion.

Similarly, the ALJ failed to discuss the September 2007 opinion of non-examining state agency psychologist Dr. Maddox. Dr. Maddox found that Plaintiff was severely depressed and likely unable to work at that time, although he expressed the opinion that Plaintiff's condition would likely improve in 12 months. (Tr. 559.) The ALJ did not mention Dr. Maddox's report specifically, but indicated that the opinion of "the agency reviewer" was unrefuted. (Tr. 21.)

The identity of the "agency reviewer" to whom the ALJ refers is entirely unclear.

Defendant acknowledges that the ALJ did not specifically address the opinions of Drs. Lipsitz and Maddox, but argues that Plaintiff has failed to establish prejudicial error.

"While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand." Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005) (internal citations and quotation marks omitted) (alteration in Draper).

Drs. Lipsitz and Maddox found that Plaintiff suffered from significant limitations due to her psychiatric impairments. These opinions lend support to Plaintiff's allegations of a disabling mental impairment. The ALJ's misstatement that no examining physician placed any restriction on Plaintiff, coupled with his failure to consider and weigh the opinions of Drs. Lipsitz and Maddox, creates uncertainty and casts doubt upon the ALJ's rationale for denying Plaintiff's claims. See Willcockson v. Astrue, 540 F.3d 878, 879-80 (8th Cir. 2008). Because it cannot be determined from the ALJ's decision whether he properly reviewed the evidence of record, the matter must be remanded.

## Conclusion

Substantial evidence does not support the ALJ's mental RFC determination. Because the RFC formulated by the ALJ was flawed, the ALJ's determination that Plaintiff was capable of performing other work in the national economy was also erroneous.

For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to properly evaluate and weigh the medical opinion evidence; formulate a new mental residual functional capacity for Plaintiff based on the medical evidence in the record, and further develop

the medical record if necessary; and then to continue with the next steps of the sequential evaluation process.    Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of Plaintiff in accordance with this Memorandum.

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of September, 2014.